JEWELL v. ROGERS TOWNSHIP.

1. HIGHWAYS AND STREETS—MUNICIPAL CORPORATIONS—FAILURE TO BARRICADE CLOSED HIGHWAY.

After having laid out, opened, improved, and maintained a road as a public highway for many years, it was the duty of the township and a quarry company which it permitted to destroy the same by extending its quarry across it, to effectually exclude public travel by barriers from that particular portion made impassable.[1]

2. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE OF DRIVER IMPUTABLE TO PASSENGER IN AUTOMOBILE.

The negligence of the driver of an automobile is imputable to a passenger, and in an action for the death of the passenger it is incumbent to show, before recovery can be had, that no negligence of either caused or contributed to the accident.

3. HIGHWAYS AND STREETS—MUNICIPAL CORPORATIONS—INTOXICATION AS CONTRIBUTORY CAUSE—QUESTION FOR JURY.

In an action against a township and a quarry company for the death of plaintiff's intestate, a passenger in an automobile which ran into an excavation across a closed public highway, where there was evidence that deceased and the driver had been drinking beer in a saloon a short

---

[1] On duty to provide barriers against abandoned highway, see note in 37 L. R. A. (N. S.) 1158.

time before the accident, the question as to what extent they were under the influence of liquor, *held*, for the jury under proper instructions.[1]

4. SAME—CONDITIONS AS TO LIGHT—QUESTION FOR JURY.

In such case, where there was some conflict in the evidence as to the exact time the accident occurred, and whether it was then getting dusk, the question as to what extent the approach of night or evening shadows might affect the clear view of one driving along the highway, *held*, for the jury.

5. SAME—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.

In order to recover it was necessary for plaintiff to show that deceased was free from contributory negligence.

6. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

In such action, where the testimony was very conflicting, the trial court properly held that the question of deceased's contributory negligence was for the jury.

7. NEW TRIAL—WEIGHT OF EVIDENCE.

Where the trial judge, who was familiar with the locality, and who heard and saw the witnesses, after twice reviewing the case, declined to disturb the verdict of the jury, or hold that it was against the great weight of the evidence, this court will not, on error, substitute its judgment for that of the jury or the trial judge.

8. APPEAL AND ERROR—HARMLESS ERROR—DAMAGES.

Where the widow testified that deceased earned $100 a month, but on cross-examination replied that he worked on commissions, and all she knew was what he told her, it was not reversible error to refuse to strike same, where she further testified that he contributed to the support of herself and child an average of $60 a month, and the expense of taking care of the child was $15 a month, in view of the size of the verdict, which was only $2,500, when compared with a possible estimate on that basis under his and her life expectancy.

9. DEATH ACT—DISTRIBUTION OF MONEY RECOVERED UNDER DEATH ACT TO WIDOW AND CHILD.

Under 3 Comp. Laws 1915, § 14577, it was for the probate court and not the jury to determine the proportion to be distributed to a mother and son of money recovered under

[1] On intoxication as affecting negligence with relation to persons injured on highways, streets, etc., see notes in 40 L. R. A. 138; 47 L. R. A. (N. S.) 737, and L. R. A. 1916F, 102.

the death act in an action for their benefit for the death of the husband and father.

10. SAME — VERDICT APPORTIONING DAMAGES — CURING ERROR BY PUTTING VERDICT IN LEGAL FORM.
    Although the foreman of the jury first announced that they had found "for the boy, $1,500; for the widow, $1,000; total, $2,500," the verdict was not therefore illegal, where it was put into legal form by the court, and in answer to an interrogatory as to whether they assessed plaintiff's damages at $2,500 against both defendants, they all answered "yes."

Error to Presque Isle; Emerick (Frank), J. Submitted October 8, 1919. (Docket No. 14.) Decided December 22, 1919.

Case by Edward Jewell, administrator of the estate of Raymond Jewell, deceased, against the township of Rogers and the Michigan Limestone & Chemical Company for the negligent killing of plaintiff's decedent. Judgment for plaintiff. Defendants bring error. Affirmed.

*Henry & Henry,* for appellant township.

*G. Covey, Jr.,* for appellant company.

*Homer H. Quay* and *C. S. Reilley,* for appellee.

STEERE, J. This action was brought by plaintiff as administrator of the estate of his son, Raymond Jewell, a young married man, 22 years of age, who lost his life on May 16, 1917, through an automobile in which he was riding falling into the pit of a quarry belonging to defendant Michigan Limestone & Chemical Company at a point where it crossed an old highway in the defendant township of Rogers. The negligence charged in plaintiff's declaration is that defendants did not erect and maintain suitable barriers and warning notices effectually closing said road after exten-

sion of the Limestone & Chemical Company's quarry across it rendered it impassable and dangerous for public travel, of which fact defendants were fully informed at the time of the accident. At the completion of plaintiff's proofs and at conclusion of the testimony, defendants' counsel moved for a directed verdict in their favor upon the ground that deceased's own negligence caused or contributed to his death, pressing the claim also by requests to charge. These were denied and the case submitted to the jury, resulting in a verdict in plaintiff's favor for $2,500. Before entry of judgment defendants' counsel moved the court under section 14568, 3 Comp. Laws 1915, for a judgment notwithstanding the verdict. The motion was denied and judgment entered on the verdict. Defendants assign 31 grounds of error directed to rulings on admission of testimony, charge of the court, and, especially, refusal to direct a verdict as requested.

Rogers township lies in Presque Isle county, of which the village of Rogers City is the county seat. Rogers City is in fractional section 15, town 35 north, of range 5 east, on the shore of Lake Huron, which in that locality has a general bearing northwest and southeast. On and near the lake shore about two miles southeasterly from Rogers City and near the site of an old location known as Crawford's quarry, is the extensive establishment of defendant Michigan Limestone & Chemical Co., called "Calcite," consisting of a large crushing plant, with numerous buildings of various dimensions, extensive dock facilities, many small dwellings for employees, etc., and a large limestone quarry extending southeasterly in favorable rock formation for over a mile, equipped with railroad tracks along its floor, steam shovels, drilling machinery and other appliances essential to extensive quarry operations. This is known as the Calcite quarry and

the defendant Limestone & Chemical Co. is also referred to as the Calcite company. The streets of Rogers City are not laid out with the cardinal points of the compass, but parallel to and at right angles with the shore of Lake Huron. Two gradually diverging roads lead in a southeasterly direction from the village for some distance, but eventually join some two and a half miles southeasterly from the village at the common corner post of sections 25, 26, 35 and 36 in said township, from which point a single road continues directly south along the section line towards Hagensville, Metz, Posen, and on to Alpena. The most westerly, called the "Third street road" is the direct and commonly traveled route. It runs southeast through the village and beyond in a straight line to where the roads come together. The other and older road on which the accident occurred, called the "Lake Shore," "Loop" or "Crawford's quarry" road leads from the village in a circuitous and more easterly route along the lake shore for near a mile past Calcite, or old Crawford's quarry, where it makes a sharp southwesterly turn and continues in that general direction to the quarter-post in the line between sections 25 and 26, thence south on the section line, to where it is diagonally joined by the Third street road at the common corner of the four sections before mentioned, from which point the old highway called the Metz road continues on south. A "short cut," about 100 rods in length, known as the "Wilson road" was also extended west across the angle to the Third street road from the quarter-post where the Crawford's quarry road turns south, connecting at right angles with the Third street road at a point over 1,600 feet above where it intersects the old shore road at the section corner. Before Third street road was opened this Crawford's quarry road was a part of the old Metz road to Rogers City, which was opened and im-

proved in an early day and for many years the main, if not the only, thoroughfare to that village from the south.

After the more direct way by Third street was improved the old shore road was comparatively little used, but was maintained as a public highway by the township, open and in safe condition for travel until, in the latter part of 1916, the Calcite company's quarry excavations working to the southeast intersected this road where it angles southwesterly across the northwest quarter of section 25 towards the quarter-post at which it turns south.

It appears that before opening its quarry across this road the Calcite company petitioned the highway commissioner of Rogers township for a discontinuance of the road and proceedings were taken by which said commissioner, on July 22, 1916, made and signed an order discontinuing that portion of the old road extending northeasterly through section 25 from its west to its north section line. This order and all official papers in connection with it remained in the hands of the Calcite company's attorney and were not filed with the township clerk until after the accident in May, 1917. The highway commissioner testified and it is admitted that the Calcite company agreed to put up barriers to guard the discontinued road and notify the public that it was closed. This the company did at the intersection of Third street and the Crawford quarry road, where it is claimed the highway commissioner directed the barrier and notice should be placed. It is undisputed that no barriers or notices were placed at the quarter-post half a mile north where the short cut, or Wilson road, strikes the Crawford quarry road, or where the short cut intersects the Third street road. There is abundant proof that the barrier, with notice upon it, which they did place where the Third street and Crawford quarry roads came together was not

substantial, or adequate, could readily be thrown down or removed, and that numerous witnesses passing that way either did not notice it at all or observed it was thrown down, outside of the traveled way. Charles Osgood, cashier of the Presque Isle County Savings Bank, who passed by there on the evening of the accident, testified no barrier was up at that time. George Endres, a business man of the village, testified he had at times seen the barriers in proper shape standing upon wooden horses across the road, but "the Sunday before the accident the barrier was down," and on the night of the accident he "placed the barrier and these horses as they had been before * * * to prevent anybody from duplicating the accident."

Otherwise than as invaded by the quarry operations the Crawford quarry road was a well built stone road, fit and in safe condition for travel, with the appearance of a used road. The place of this accident, where the quarry is excavated across the line of the old highway, is approximately two-thirds of the distance from the quarter-post where the road turns northeast and diagonals in that direction across the northwest quarter of section 35 to where it reaches the north line of said section. The discontinued highway as described in the proceedings for vacation is that small portion of the Crawford quarry road which runs diagonally in a northeasterly direction across the above described 160 acres from its southwest corner. In each direction the Crawford's quarry road continues as formerly, an improved highway legally laid out and open to public travel, so far as this record discloses. At the time of the accident the quarry at the place it crossed this road was 34 feet 5 inches deep, from the surface where the road ran to its brink on the south side or, as otherwise stated, that was "the distance from the edge of the cliff down to the floor or base of the quarry."

The two men, Wright and Jewell, who met their death in this accident, were sewing machine salesmen, or agents. Plaintiff's intestate, Raymond Jewell, was then living with his wife in Rogers City, having recently taken an agency from the Davis Sewing Machine Co. covering Rogers City, Alpena and other territory. Willard Wright, who owned and drove the car at the time of the accident, was a salesman for the Bruce Sewing Machine Co., whose field of operations was in the southern part of the State. He had driven a car during two years previous, mostly a Ford which he owned, and was an experienced driver. He had a cousin named Ellis Wright living in Alpena at whose house he stayed the previous night and on the day of the accident they went over to Rogers City together, each driving his own car, arriving there about noon. Ellis Wright testified that, so far as he knew, Willard had not previously been to Rogers City since 1915, at which time he rode over with him and they drove around by the Lake Shore, or Crawford's quarry, road.

· In the afternoon the Wrights spent a couple of hours with a man named Hagle on some contract he had involving jobs situated at different places, and Ellis Wright rode with him around town for a time. Willard Wright and Jewell were also seen riding together at about 4:30 going north on Third street in a Ford car. Ellis Wright testified that "somewhere about 4 o'clock" he went with Hagle, Jewell and Willard to Adolph Mende's saloon where they "drank a little beer," talked together, told stories, had some singing and dancing and passed the time until between 5:30 and 6 o'clock when he went home with Hagle; that Jewell and his cousin were sober when they left them, and about an hour later on returning down town they heard the boys were killed and started down there in Hagle's car to see who it was, meeting a Mr.

Kitchen who told witness it was his cousin wno had been killed. He estimated the time of their starting as "somewhere around 7 o'clock" and stated it "was just getting dusk."

Jewell and Wright appear to have left Mende's place and started on their fatal ride in Wright's car, which he was driving, not long after 6 o'clock. A barber named Londo saw them drive past his shop in the central part of the village at 6:15, driving as he judged about 15 miles an hour. Eugene D'Vincent, the county clerk, who knew Wright, had seen them riding together earlier in the afternoon and saw them passing his house on Frederick street coming up town from the direction of Mende's place at about half-past or "may be 20 minutes," after 6 o'clock, driving a "little fast" and noticed them turn the corner at Larke street, which joins Third street. He noticed the driver made the turn as a skillful chauffeur would and did not see anything peculiar about their conduct except "they came along at a fairly good rate of speed and made a good turn and one of the boys" slapped the driver on the back when he made the turn. A man named Wilson Pines who lived "in the second last building going out towards Metz" testified that he was out in his yard after supper to pick up some stuff for wood when his smallest child went out on the road and he heard somebody "give a yell out of them," and looking up he saw dust and an automobile coming. He called his child, going out into the road after him, and took him away, and the automobile passed at what he estimated as "between 30 and 35 miles an hour—something like that," and they yelled again just as they went by him. They were next seen by an employee of the Calcite company named Turner, who operated a drill at the quarry and was on the top of the cliff at the southerly edge of the quarry putting on his overalls to go to work, about five rods from where the old Craw-

ford's quarry road terminated at the cut and saw them go over. He first saw them when they were "about seven or eight rods" from the cliff, driving he "should judge about 25 miles an hour," and saw them plunge over it. He testified that it was then daylight, gave the time when he first saw them as "between five and ten minutes after seven" and did not observe that they slackened speed before the car went over. Both were dead at the bottom of the cliff on the floor of the quarry 34 feet below when he and a fellow workman ran to the edge of the quarry to see if they could help them. Why these men attempted to go over this road is but conjecture and of little significance. It was a comparatively short drive of but a few miles around this triangle back to Rogers City over a good stone road except for this deep quarry, cut across it by the Calcite company, and, so far as any public record showed, over a long opened and used public highway. If they turned northeast from the Third street road to the left towards the lake at where the short cut, or Wilson road, leads across to where it joins the Crawford's quarry road and along it northeast to the place of the accident, they went over a road upon which no warning notice or barriers were ever placed. If they went the longer way, continuing out the Third street road to its intersection with the Crawford's quarry road at the section corner, the inadequate barrier and notice which had been placed there were torn down that evening, and from there to the point at which the old road is claimed to have been discontinued is half a mile north.

After having laid out, opened, improved and maintained this road as a public highway for many years, permitting and inviting its public use as such, it was clearly the duty of the township and those it permitted to destroy the road at that point to effectually exclude public travel from that particular portion of

it made by them totally impassable and exceptionally dangerous by such fences, barriers and other means as would plainly warn travelers of the danger, and to maintain the same while such dangerous conditions were continued with an otherwise open, improved highway deceptively leading to the danger. This duty is sharply made manifest by the conditions shown here, where a deep, unguarded, sunken quarry was cut across this well-known highway by a private company, authorized so to do by the highway commissioner under incompleted steps to discontinue but a short section of a long and long-used legal thoroughfare, leaving the same with unmarked dead ends at each extremity of the portion proposed to be discontinued. The law is too well settled on that subject to call for discussion or citation of authority and there was abundant evidence to carry the question of these defendants' negligence to the jury.

The closer question to the merits of the case is the asserted contributory negligence of deceased. It is urged for defendants that facts not controverted entitle them to a directed verdict on that ground. Plaintiff's intestate was a passenger. He was riding with Wright who owned and drove the car. As to this the court very fully, emphatically and correctly charged the jury that the negligence of the driver was imputable to the passenger, and that it was incumbent upon plaintiff to show before he could recover that no negligence of either caused or contributed to the accident, that "if the negligence of Jewell or the negligence of the driver, Wright, either caused the injury or contributed to the injury—was a part of the cause of the injury, the plaintiff in the case cannot recover."

Counsel for defendants contend in the first place that the evidence that those men were intoxicated at the time of the accident is beyond controversy, particularly emphasizing what is stated to be the undisputed

testimony of an employee of the Calcite company named Pines who testified that he went into Mende's saloon that evening at about half-past 6 to get a pail of beer; that Wright, whom he knew, was there with Jewell; they were having a good time and singing, asked him to have something to drink and he drank two glasses of beer with them and they paid for his beer, including what he got in his pail; that he was not in there over five minutes, and "they were drunk at that time." On cross-examination he said he "took them for drunk," but there was nothing outside of their singing and joking. Jewell was shown to be a good singer who sang frequently on public and private occasions. In view of the testimony that these men drove past Londo's barber shop down town at 6:15, and up past D'Vincent's place at 6:20 or half-past six, as they describe, it was not for the court to accept Pines' narrative of events in Mende's saloon at half-past 6 as beyond controversy. These men are not shown to have drank at all until after 4 o'clock that day, nor anything stronger than beer. That Wright was a good driver, could and did drive well and skillfully when last seen in the village, is undisputed. If and to what extent those men were under the influence of liquor was properly left to the jury with a plain instruction in substance that it was for them to decide that question from all the evidence in the case and determine whether and to what extent it affected their judgment or rendered them careless and reckless; and in its direct application whether by reason of such condition they, or the driver, failed to exercise the ordinary care and caution which a prudent and careful driver would exercise under like circumstances.

Defendants also emphasize the fact that these men drove over the cliff in broad daylight as impelling evidence of their negligence. Defendants' testimony

shows that it was yet daylight. There is some conflict in the evidence as to the exact time it occurred, and whether it was then getting dusk. Defendants' own testimony shows that it occurred about sundown. Turner gives the time as 5 or 10 minutes after 7, and John Marsters, superintendent of the Calcite company, testified the sun set at 7:12 on that date, that he went over to the scene of the accident a few minutes after 7 and it was "quite light at that time." How light and to what extent the approach of night or evening shadows might affect the clear view of one driving along that highway were purely questions of fact for the jury to determine and apply to the chief question of deceased's, or the driver's, negligence. It was so left by the court to the jury. Other things along the way as it approached the cut, of which defendants introduced testimony, are insisted upon as ample warning of danger ahead, and urged as conclusive evidence of contributory negligence—such as the fact the timber was cut away for about 500 feet back of the quarry, giving a view to one approaching on the road of the operations going on at that place, electric drills near the edge of the cut, steam shovels, engines, etc., down in the quarry; and about 105 feet back of the cliff a water pipe crossing it, a drill case, wires, poles and other things on or near the road, some of which were in the road and driven over by those men, and other similar evidence of operations furnishing argument against due care. These were referred to with considerable detail by the court in charging the jury and submitted as proper matters for them to carefully consider in their bearing upon the question of contributory negligence, from which plaintiff must show freedom in order to recover.

It was shown that the old Crawford's quarry road ran right to the edge of the cut, or cliff, with no traveled highway turning from it to the right or left; that

it was in as good condition and fit for travel there as other portions of the road except for the water pipe across it and four or five small poles over which Turner, who said the timber was cut back 7 or 8 rods, stated the automobile "bounced" as they approached the edge of the cliff, the poles, water pipe, etc., all being within 130 feet of the edge.

There was abundant evidence visualized by photographs that a person driving along the road in the direction these men were going could not see the quarry itself until within a very short distance of its almost perpendicular edge. How far back of the cliff was in dispute. A witness named Lozien, who worked for the Calcite company at the time of the accident, driving a team hauling sand and dynamite, and had stopped parties driving towards the quarry when they were within 200 feet of it, was familiar with and had teamed around that side of the quarry and testified that from the edge of the clearing, which he estimated about 500 feet back, a person could see no part of the quarry, not even its easterly edge or bank, and that a person going in that direction had to get within about 30 feet of it before he could see anything. These distances were disputed and there was testimony that the east edge of the quarry could be seen much farther back, but in any event the point upon the road at which it was possible to discover that the quarry was cutting across it was an issue of fact.

At defendants' request the jury was taken over the road by the sheriff to the place of the accident and viewed the premises under instructions from the court, being properly cautioned and advised that it was a permissible proceeding in the progress of a trial for the jury under direction of the court to view the premises involved to aid them in understanding the evidence given as to the physical locations of roads, etc.

In denying defendants' motion for a judgment not-

withstanding the verdict, and again in denying their motion for a new trial, the court reviewed the case at some lenght, pointing out and holding that the conflicting testimony made the negligence of plaintiff's intestate an issue of fact necessarily for a jury rather than the court; and that the court was not able to say the verdict was clearly contrary to the great weight of evidence, or the result of passion, prejudice or incapacity on the part of the jury to intelligently perform its duty. Citing upon this proposition *Krouse* v. *Railway*, 170 Mich. 438; *Silverstone* v. *Assurance Corp.*, 187 Mich. 333; *Mink* v. *Railway Co.*, 194 Mich. 324.

The record indicates a very full and fair trial with able counsel on both sides, before a jury whose intelligence and integrity are not questioned and who inspected the premises before passing upon the evidence. The trial judge, who shows familiarity with the locality and like the jury heard and saw the witnesses, after twice reviewing the case declined to disturb the verdict, or hold that it was against the great weight of evidence. After a careful examination of this record we find no occasion to substitute our judgment for that of the jury or trial judge. Plaintiff's intestate left a wife and son three years of age. When killed his expectancy of life according to the mortality tables which were introduced in evidence was 36 years, that of his wife was more. The court very fully and correctly instructed the jury upon the measure of damages, confining recovery by the plaintiff-administrator, if entitled to a verdict at all, to such sum as the evidence showed deceased would have contributed for support of his widow, and child during his minority. The widow in testifying to her husband's earnings gave them at one time as $100 a month, but on cross-examination replied that his income was from commissions on sales and all she knew about it was

what he told her.  Reversible error is urged on re-
fusal of the court to strike out her testimony as to her
husband's earnings.  In the light of her further tes-
timony that her husband had contributed to the sup-
port of herself and child an average of $60 per month,
and the expense of taking care of their child was about
$15 per month, and the size of the verdict compared
with a possible estimate on that basis under his and
her life expectancy, we regard the ruling complained
of as immaterial.

Complaint is made that the verdict was illegal be-
cause the jury apportioned the amount of the verdict
between mother and son, while the proportion'to which
each was entitled had a general verdict been rendered
would be a matter for distribution by the probate
court under the so-called death act 3 Comp. Laws
1915, § 14577.

The basis of this assignment of error is as follows:
When the jury reported an agreement and returned
into court to render their verdict and in answer to the
court's inquiry the foreman stated they found for the
plaintiff, the following questions were asked and an-
swered:

*"The Court:* In what sum?
*"The Foreman:* For the boy, $1,500; for the widow,
$1,000; total, $2,500.
*"The Court:* $2,500 against both defendants?
*"The Foreman:* Yes, sir."

The verdict was then put into legal form as a ver-
dict for the full amount in favor of the plaintiff against
both defendants, concluding:

"And you assess the damages of the plaintiff on
occasion of the premises at the sum of $2,500; so say
you, Mr. Foreman?
*"The Foreman:* I do.
*"The Court:* And so say you all, gentlemen of the
jury?
*"The Jury:* Yes, your honor, we do."

After which the verdict was entered by the clerk in regular form.

That the jury agreed to a verdict in favor of the plaintiff for $2,500 is made plain by the foreman's first answer. The proposition as to how it should be divided was, as counsel suggest, outside the jury's duty or authority. For the court or clerk to put the verdict announced by the foreman in proper form before taking it as a finality is the usual course. This was done after the court concisely inquired and was told their verdict was for $2,500 against both defendants. All the jury answered the interrogating announcement of their verdict as legally formulated in the affirmative. No request for a poll of the jury or objection to the course pursued was made by defendants' counsel at that time. We see little force in the objection as now made.

No reversible error is found and the judgment will stand affirmed.

BIRD, C. J., and SHARPE, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.